321 So.2d 380 (1975)
O. L. HAAS, Sr.
v.
SOUTHERN FARM BUREAU CASUALTY INSURANCE COMPANY.
No. 6715.
Court of Appeal of Louisiana, Fourth Circuit.
April 15, 1975.
On Rehearing October 9, 1975.
Writ Refused November 21, 1975.
*381 Becnel & Kliebert, Larry C. Becnel, Vacherie, for plaintiff-appellee.
Porteous, Toledano, Hainkel & Johnson, Christopher E. Lawler and John J. Hainkel, Jr., New Orleans, for defendant-appellant.
Before LEMMON, SCHOTT and BEER, JJ.
LEMMON, Judge.
In appealing from an adverse judgment in this suit involving a collision between a moving and a parked vehicle, Southern Farm Bureau Casualty Insurance Company, liability insurer of the driver of the moving vehicle, contends that plaintiff O. L. Haas' contributory negligence in parking in a dangerous position was a legal cause of the collision which bars Haas' recovery of damages to his car.
The accident occurred on La. Highway 20 in Vacherie. At that point the highway was a straight, two-lane road, 18 feet wide, with a three-foot shoulder on each side and a ditch along each shoulder. Residences and business places were located on both sides of the highway, which was a heavily traveled artery.
At about 6:00 p. m. on January 10, 1972 Haas parked his car in front of one of the residences which fronted on the highway. Although he used a narrow driveway across the ditch to park as far off the highway as possible, his parallel-parked car remained partially in the northbound lane, so that it was necessary for a northbound car to cross the center line in order to pass Haas' parked vehicle. Haas left his emergency lights blinking while he went inside the residence.
Farm Bureau's insured, Carroll Levet, traveling north on the highway, came along about ten minutes later and ran into the rear of the Haas vehicle. Levet testified he never saw the parked car and was blinded just before impact by the headlights of an oncoming vehicle.
Tommy Morvant, driver of the oncoming car, testified that when he saw the parked car with its blinking lights and noticed Levet's car approaching about 30 yards behind the parked car he slowed down while about 100 yards away from the parked car in order to let Levet pass safely. (Levet stated that Morvant's car was just past the point of collision when the impact occurred.)
The record further established that there was no other traffic on the highway at the time and that there were several other places in the vicinity where Haas could have parked his car completely off the highway.
We conclude Levet's negligence was a legal cause. Although he may have been momentarily blinded just before the accident, he had traveled a considerable distance on the straight highway (with no other traffic in the area) before being blinded and should have seen the parked car with blinking lights if he had exercised reasonable care and kept a proper lookout. His inattention was a cause-in-fact of the accident, and his breach of his duty to observe what he should have seen created a risk of colliding with traffic obstructions *382 which made him legally responsible for the resulting collision.
We next inquire into Haas' conduct in parking on the traveled portion of the busy highway. Using the procedure outlined in Laird v. Travelers Ins. Co., 263 La. 199, 267 So.2d 714 (1972) and in Pierre v. Allstate Ins. Co., 257 La. 471, 242 So.2d 821 (1970), we first determine whether that act was a cause-in-fact of the accident. If Haas had not parked in a position which partially obstructed the highway, the accident would not have occurred, and the determination that this act was a cause-infact presents no difficulty.
Inasmuch as the mere existence of the causal relationship does not establish legal liability for ensuing harm, we next consider the duty imposed and the risks encompassed within that duty. The duty to refrain from parking on a highway is imposed as a safety measure in order to keep traffic arteries open.[1] The obstruction of highways not only impedes passage, but also creates a risk that a confused or inattentive driver will collide with the stationary vehicle. The risk of harm created by a motorist's obstructing a highway imposes a reciprocal duty on motorists to refrain from doing so.
The exact risk sought to be avoided by imposition of this duty came into being when Haas parked so as to leave insufficient room on the highway for unobstructed passage of northbound vehicles. Admittedly, Levet's inattention constituted later and intervening negligence, but the hazardous condition created by Haas' negligence continued up to the moment of the accident, and the concurrent substandard behavior of both parties combined to create the particular risk involved and to bring about the collision.
Haas contends, however, that the facts of this case fall somewhere between those of the Pierre case (where liability was imposed on the parked defendant) and the Laird case (where liability was not imposed).
Each case, of course, must be considered according to its own facts and circumstances. Under the circumstances of the Laird case the court, recognizing that duties are imposed on motorists to protect some persons under some circumstances against some risks, held that the risk of the occurrence of the ensuing collision with this particular following motorist did not fall within the ambit of Laird's duty, inasmuch as there was no oncoming traffic; the following motorist could have passed Laird without moving out of his assigned lane of traffic; Laird's vehicle, almost completely off the highway with brake lights on, was (even to an inattentive or momentarily distracted driver) obviously stopped; signs warning of highway construction should have alerted any driver that the highway ahead might be blocked; and a person standing by the stopped vehicle attempted to warn the oncoming driver by shouting and waving.[2]
Of these operative facts emphasized in the Laird case, only the warning lights were present in the instant case. This factor, however, is relatively insignificant standing alone, since the accident in the Pierre case happened in broad daylight.
Although Haas' counsel presented a forceful argument and a cogent analysis *383 of the recent cases decided on the duty-risk theory, we conclude that Haas breached a duty of reasonable care by obstructing the highway when it was practicable to park elsewhere and that his breach created the exact risk which the duty not to obstruct highways is designed to prevent. There is an "ease of association" between the duty imposed, the risk created and the damages inflicted. Hill v. Lundin & Associates, Inc., 260 La. 542, 256 So.2d 620 (1972); Prosser, Handbook of the Law of Torts, Ch. 7 (4th Ed. 1971).
Nevertheless, while Haas' concurrent negligence was a legal cause of the accident, he is entitled to recovery because of the applicability of the doctrine of last clear chance.
In Jackson v. Cook, 189 La. 860, 181 So. 195 (1938) the Supreme Court held that the doctrine applies not only when the defendant actually discovered a continuingly negligent plaintiff's position of peril in time to prevent the accident and failed to do so, but also when the defendant should have discovered such plaintiff's position of peril. Although Louisiana is apparently the only jurisdiction which extends the doctrine to last clear chance to accord recovery under these circumstances, the Jackson case has never been overruled. See the denial of certiorari in Nixon v. Southern Rwy. Co., La., 293 So.2d 182 (1974).
In the present case, therefore, we conclude that although Haas' negligence continued up to the instant of the accident, his recovery is not barred by his contributory negligence inasmuch as Levet had the "unconscious last clear chance." See Restatement (Second), Torts § 479 (1965).

DAMAGES
Haas purchased the 1972 Cadillac on September 22, 1971 for $7,858.99.[3] After the accident less than four months later, Haas' collision insurer (coincidently Farm Bureau) paid him $2,327.87, the estimated cost of repairing the patent damage.[4] Haas then purchased a new car and was allowed $3,100.00 as the trade-in or salvage value of the wrecked car in an unrepaired condition. He now seeks in this suit to recover the damages he sustained in excess of the amount paid by the collision insurer.
An expert in appraising automobile values, whose company had originally sold Haas the subject automobile, inspected the car after the accident and found extensive body and chassis damage. He testified that the car was in excellent condition just prior to the wreck and opined that, because of the scarcity of Cadillacs in January, the car with only 4,000 miles of use could have commanded as high a price just before the accident as the original sales price.[5]
The expert further stated that the extensively wrecked car, had it been repaired, would have suffered a substantial value inferiority (depreciation) in comparison to an identical car (of similar age and mileage) which had not been wrecked. He estimated the value of the car, if repaired after the wreck, to be $5,000.00 to $5,400.00, thus indicating a value inferiority attributable to the collision in the range of $2,400.00 to $3,000.00.
The trial judge awarded $2,372.13, calculated by subtracting the damages paid by the collision insurer and the salvage value from $7,800.00, which the judge found to be the value just prior to the accident. This amount is also supported by the value *384 opinions contained in the only expert testimony in the record.
The judgment is affirmed.
AFFIRMED.
LEMMON, J., concurs specially and assigns reasons.
BEER, J., dissents and assigns reasons.
LEMMON, Judge (concurring specially).
In a separate opinion in the Nixon case, I respectfully suggested that the holding of the Jackson case be reexamined. This issue was in a peculiar posture upon application for certiorari in the Nixon case in that the majority of this court, although discussing last clear chance, found the defendant free from negligence and the plaintiff was the party seeking review. Because three members of the Supreme Court voted to grant certiorari and a fourth voted to deny certiorari to the plaintiff because the rationale in the Jackson case was wrong, I respectfully reurge my previous suggestion.
BEER, Judge (dissenting).
I respectfully dissent.
I am unwilling, in circumstances such as those existent here, to acknowledge the validity or applicability of the doctrine of "last clear chance." I do not believe that a parked automobile, protruding barely one foot onto a heavily traveled, 18 foot state highway, at night, has the right to have the doctrine applied in its behalf and against the adverse driver, notwithstanding the fact that its blinkers were blinking.
Independent witness Morvant located the Cadillac as follows: "He was on the side of the road, most of the way, with about two wheels on the road." (Emphasis mine.) Morvant also described the position of the Cadillac as ". . . he was in the driveway but his wheels were sitting on the blacktop of the edge [of the highway]."
Morvant testified that he had to slow down to let Levet "get around" plaintiff's car which, I feel, supports Levet's testimony about the blinding effect of Morvant's lights. Morvant said that the highway was heavily traveled at that time and further acknowledged that Levet "would have to come partially into your [Morvant's] lane" to "get around" the parked Cadillac.
The position of the parked Cadillac was such that Levet neither actually discovered the negligent plaintiff's perilous position nor was, in my opinion, obliged to have discovered it. The position in which the plaintiff's car was parked was a subtle perilalmost a trap and the flashers were of little significance in these circumstances since the Cadillac was only "about a foot" on the highway and would have appeared to be off the traveled portion. I feel that Haas was negligent and that his negligence was more proximate because of its subtleness. He had any number of places where he could have safely and legally parked to fulfill his mission, well-intentioned as it may have been. He chose one of the most perilous possible methods of parking his car, and, though it is of little significance, his testimony is unfactual with respect to the positioning of the car for he says it was completely off the highway.
The majority concludes (correctly, I think) that ". . . Haas' negligence continued up to the moment of the accident" and, further, that such negligence ". . . combined . . . to bring about the collision." "Nevertheless," says the majority, Haas recovers "because of the applicability of the doctrine of last clear chance." In the circumstances of *385 this case I find its applicability unwarranted on the facts and on the law.
Thus, I respectfully dissent.
Before LEMMON, SCHOTT and BEER, JJ.
LEMMON, Judge.

ON REHEARING
On rehearing defendant first contends the evidence does not support a finding that Levet was negligent. We have again reviewed the record and conclude that Levet was negligent either: (1) if he was only momentarily blinded just before the accident, in failing to see the parked car, with its taillights blinking, before the interference with his vision, or (2) if he was blinded several seconds before the collision, in continuing forward on the highway in a blinded condition without slowing or otherwise taking steps to bring his vehicle under proper control. Under either version of the facts Levet's substandard driving was a substantial legal cause of the accident.
Defendant next contends that if the substandard behavior of each party was a legal cause of the accident, then plaintiff should not be allowed to recover simply because his negligent act occurred first, particularly since plaintiff's gross disregard of the safety of other motorists set a continuing trap for those motorists who were momentarily distracted. Arguing that the decisions of the Supreme Court in Dixie Drive It Yourself System v. American Beverage Co., 242 La. 471, 137 So.2d 298 (1962) and Pierre v. Allstate Ins. Co., 257 La. 471, 242 So.2d 821 (1970) effectively abrogated any legal theory which would serve to relieve all but the last wrongdoer of liability, defendant urges that justice in this particular case cries out for denial of recovery to a grossly negligent plaintiff who can only point to the chronology of events as the basis for his claim.
Defendant is essentially quarreling with the doctrine of last clear chance insofar as recovery is allowed purely on the basis of whose negligence occurred first.[1] We agree that allowing recovery solely on that basis is inconsistent with the rationale of the Dixie and Pierre cases and the abrogation of passive negligence defenses. Nevertheless, there was no contributory negligence in the Dixie and Pierre cases,[2] and the court was not confronted with the inconsistency problem of applying last clear chance under those circumstances. Therefore, the unconscious last clear chance doctrine of Jackson v. Cook, supra, remains viable unless overruled by the court which introduced the doctrine.
Our original judgment affirming the judgment of the trial court is reinstated.
Judgment of the trial court reinstated.
LEMMON, J., concurs and assigns reasons.
BEER, J., dissents and assigns reasons.
LEMMON, Judge (concurring).
Defendant's visceral reasoning is that a grossly negligent actor should not recover damages from a second person whose lessor variation from the requirements of due care results in that second person's falling into the first actor's trap. This is essentially a comparison of the two negligences.
I agree that the application of comparative negligence is the only method of *386 achieving justice in this case.[1] Nevertheless, I concede the sole authority of higher courts to implement this method.[2] Reluctantly disregarding plaintiff's trap-setting culpability, I vote to allow him full recovery.
BEER, Judge (dissenting).
I respectfully dissent for I cannot agree with the result that is reached in spite of my acknowledgement to my brothers on this panel that I am now less than sure of the correctness of my previously stated conclusion that Levet was free from negligence.
This is a frustrating case in which I am constrained to agree that the majority has much merit to its ratio decidendi even though it generates a conclusion that I feel unable to accept. My gnawing frustration may be borne of a notion that perhaps the time has about come when we must cope evergrowing pressure to accept the doctrine of comparative negligence into our decision making process.
Our state has hundreds of thousands of automobiles and trucks constantly operating within its boundaries during each working day. These vehicles encompass the entire spectrum of operating efficiencyfrom the standpoint of the skill with which they are driven (or parked) and the condition in which they are maintained. Thus, at any given moment, accidents can and do take place in a variety of instances where fault varies from the barest minimum to the grossest maximum.
I believe that our Louisiana courts should prepare to deal with this phenomenon on a more realistic basis than has heretofore been the case. The United States Supreme Court has, as exemplified in their landmark decision in International Shoe Co. v. State of Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), often turned to "traditional notions of fair play and substantial justice" to unravel knotty scio-economic-legal issues. This, I believe, is proper and within the boundaries of acceptable procedure in the 1970's. The legislative and executive branches of our tripartite system of government have indicated a willingness to move in a direction toward emphasizing substance rather than from and the judiciary should, with care and caution, follow suit. Does this require an "opening" toward the concept of comparative negligence? I think it does. I believe that such a conceptual approach is more in tune with these times. Indeed, the idea of comparative negligence is not only more realistic but more responsive to the kind of substantial justice that these complex times seem to require.
Urbanized as we have become in this great open state of ours, considerations must change as we deal with the problems which technological growth and population explosion have produced. Many accidents now result from the very fact that our city streets and state highway systems are overloaded and ill used. Because of this, more and more accidents now result from the combined oversights and predelictions of several drivers than ever before. Though a substantial number of accidents result from single instances of negligence, a vastly greater number are the result of "fault" on the part of more than one driver.
*387 Americans are inclined, in most controversial matters, to "split the difference." Our national character tends toward a compromise approach to "head and head" confrontations except in matters where moral considerations predominate.
This basic tendency certainly spills over into the area of judicial deliberation but meets with great frustration in jurisdictions where comparative negligence is not the rule. Many lawyers and judges believe that juries follow the doctrine whether or not it is the law of the jurisdiction. I am inclined to agree. When a jury hands down a "compromise verdict," it really is a comparative negligence verdictor very close to it. Some appellate judges in those jurisdictions which do not recognize the concept of comparative negligence are now feeling a sort of judicial frustration with the situation. Even in states where the legislature has signaled a reluctance or unwillingness to accept the doctrine of comparative negligence, appellate courts are, in some instances, proceeding on the basis of "active judicial interpretation" to bring comparative negligence into the law of the state. In Nga Li v. Yellow Cab Co. of Cal., 13 Cal.3d 804, 119 Cal.Rptr. 858, 532 P.2d 1226 (1975) the California Supreme Court has now held that a plaintiff's causal negligence will not bar tort recovery. Specifically, that court has judicially adopted a comparative negligence system. In doing so, the court took the "judicial initiative" even though contributory negligence was part and parcel of the California law by both prior legislative and prior judicial pronouncement.
Following the California Civil Code, the court determined that it was committed to a continuation of interpretation through "dynamic expression" and held that such a course now required that they supersede the "all or nothing" rule of contributory negligence within the doctrine of comparative negligence.
Across the country in Florida there are similar stirrings. In Hoffman v. Jones, 280 So.2d 431 the Florida Supreme Court has very recently promolgated the judicial adoption of comparative negligence.
Our changing society has, itself, been the most prolific producer of social, economic and legal developments whose "time has come." True, there have been moments of great leadership from the courts, from the legislatures and from the executive branch of government. But, by and large, our national will and our national conscience have been the real forces that have seen us through those episodes of "future shock" that traverse the whole spectrum of our national actions.
I believe that the doctrine of comparative negligence is "on the march" and will eventually be recognized in our great state either by legislative will, judicial fiat or some combination of the two.
How it is achieved may be less important than it has been in the past when courts and legal scholars may have been more concerned with form than substance. I say this as a firm believer in the art of judicial restraint. Indeed, as a more or less traditional and, perhaps, conservative judge I am somewhat surprised to find myself holding these views. But, as has been said, there is nothing stronger than an idea whose time has come and that, I believe, describes the situation regarding comparative negligence.
The California Supreme Court has, in the Nga Li decision referred to an interesting article in the Harvard Law Review (Mishkin, Foreword, The Supreme Court 1964 Term (1965) 79 Harvard L.Rev. 56, 60-62) which discussed "issues involving renovation of unsound or outmoded legal doctrines." (Emphasis mine.)
I believe that contributory negligence as a complete bar to recovery is outmoded and the law is in need of renovation on this important front. The method by which this is accomplished should, however, take place within the guidelines of sound and responsible judicial (or legislative) conduct. How this is ultimately translated into a *388 realistic and properly operating premise is the basic responsibility of all of us who care about the orderly administration of justice whether we are legislators, law professors, lawyers or judges.
If we handle the matter expeditiously and well, I believe that the result will not only be a fairer and more equitable rule of law but will also be the basis for more realistic verdictsa boon for plaintiffs and defendants. While it may be true that the instances of recovery by plaintiffs will doubtlessly be higher, the quantum of the award should be more reasonable because judges and juries will have the green light to do what they have very often wanted to do any way "split the difference" on a realistic basis.
NOTES
[1] We do not discuss statutory violations. There was no evidence of signs prohibiting parking [R.S. 32:143, subd. A(14)], and R.S. 32:141 may not have been explicitly applicable to this locality. Nevertheless, criminal statutes do not define civil liability, but only provide guidelines (often in terms of minimum standards of behavior) for determining liability in civil cases.
[2] Although not adopted as controlling in the majority opinion in the Laird case, another point of view advanced was that Laird's slight and momentary obstruction, under the totality of existing circumstances, was not such substandard behavior as to warrant imposition of liability.
[3] $7,752.50, plus $106.49 for air bags.
[4] The estimate left open any charges for hidden front and rear end damage.
[5] He estimated that the slightly used car could have been sold in January for approximately $7,800.00 to $8,000.00. He further noted that Haas' sales price reflected a substantial discount given because of Haas' friendship with the dealer.
[1] This application of the doctrine differs from that of the doctrine of discovered peril, in which a defendant actually discovering a plaintiff's peril refuses or otherwise fails (with a reasonable opportunity to act) to protect plaintiff against the consequences of his own negligence.
[2] In the Dixie case the plaintiff was the lessor of the truck, and in the Pierre case the plaintiffs were the surviving children of a truck passenger. Thus, parking negligence could not be imputed to the innocent plaintiff in either case.
[1] Depending upon the form of comparative negligence applied, plaintiff's recovery would be reduced (under pure comparative negligence) or entirely barred (under certain modified applications), if plaintiff is found to be more than 50% negligent.
[2] Agreeing with the views expressed in Judge Beer's dissenting opinion on rehearing, I reiterate my statement in the concurring opinion in Kontomitras v. New Orleans Public Service, Inc., 314 So.2d 441 (La.App. 4th Cir. 1975) that "doctrinal tort writers are almost unanimous in condemning contributory negligence, perhaps the only point of controversy being whether comparative negligence should be adopted by the courts or the legislature.. . . (Earlier erroneous) judicial interpretation. . . is always subject to judicial correction. See concurring opinion in Broussard v. Heebe's Bakery, 263 La. 561, 268 So.2d 656 (1972)."