BEER, Judge.
On May 26, 1973, as darkness fell, fourteen-year-old Martin Foss and his friend, Mark Page, were riding bareback on separate mounts from a stable located near the intersection of the levee of the Seventeenth Street Canal and the railroad tracks of the New Orleans Terminal Company. They had crossed the tracks and ridden along the canal levee in a northward direction to join Angelle Trotter and Heidi Tull near An-gelle’s home located on Bellaire Drive in close proximity to the levee here described. Shortly thereafter, the boys rode past the home of James J. Budendorff (also located on Bellaire Drive) and stopped to pass some time with Kenny Budendorff and several other acquaintances and friends gathered there.
Using Kenny’s unloaded B-B gun, Keith Long, minor son of defendant Robert A. Long, fired the air rifle in the direction of the riders, allegedly startling the horse “Topper,” on which Martin was mounted. The record is not absolutely clear as to whether a previously fired shot from the unloaded air rifle had just previously startled Topper, but there is evidence to this effect.
From this point, the testimony varies as to what sequence of events took place after the gun was shot.[1] According to Mark Page, Topper began acting up. Even with the reins pulled tight, the horse exhibited some tendency to break into a run as Martin rode him across a nearby vacant lot and up to the levee of the Seventeenth Street Canal. Thereafter, Martin apparently permitted Topper to run along the levee in a southward direction toward the railroad tracks. Mark followed, more slowly, in that same direction. By then, it was dark, and . Mark was apprehensive about riding fast on the levee.
Contradicting this sequential description to some extent, Kenny Budendorff (owner of the gun), testified that after the shot “They just walked by like they were doing before. Nothing different.” (Vol. VI, p. 187.) Another companion, Donald Thomas, confirms the opinion that there was no immediate reaction to the shot. (Vol. VI, p. 209.)
*195 Mark Page was of the opinion that Martin’s control of Topper was never as complete after the incident of the gun being shot as before. He felt that the horse had been “spooked” and that this nervous state continued to some extent for some period of time. Yet, this view does not completely square with Martin’s own testimony which indicates that he ran the horse along the levee to the tracks, but then stopped, turned, walked the horse to the crest of the levee, looked for Mark, descended the levee down to a point near the tracks and was, thereafter, injured.
Although Martin’s testimony indicates that he spoke to Mark indicating that he would let Topper run along the levee and was answered with a refusal to join in such a venture because of the danger of the darkness, Mark testified that there was no conversation but only that Topper ran ahead of his horse and kept on going. Mark says that he called out instructions on how to stop Topper as he proceeded behind them in the same direction but at a slower pace.
From this chronological reference point, there is a void. Martin has no recollection of what took place from this point onward and only is able to pick up the thread of events quite some time after he was injured. Nor is the void filled by the testimony of Mark, who reached the tracks previously described, saw no sign of Martin or Topper, but noted a moving train which, after it had passed the point where the levee more or less intersects with the tracks, disclosed Martin painfully injured and in obvious distress on the strip of ground between the two sets of tracks, one set of which having just been used by the passing train. Mark went to Martin’s aid, moved him away from the tracks, summoned help and deserves much credit for his clear headed, straight forward efforts in Martin’s behalf, as does Dr. George N. By-ram, Jr., whose actions, likewise, both personal and professional, were exemplary and fruitful.
Appellee, Foss, filed suit and these appeals are from a judgment rendered in favor of plaintiff individually, in the amount of $10,000, and as administrator of his minor son, Martin Foss, in the amount of $25,000. Also appealed is the judgment in favor of defendants New Orleans Terminal Company and Alabama Great Southern Railroad Company dismissing plaintiff’s suit against them.
We assume, for the purposes of our consideration of the case, that the jury, in its deliberations, selected and found credible, all of the admissable evidence most favorable to the plaintiff’s case. We are of the view that the interrogatories which the jury answered preempt our further inquiry concerning the actions which took place near the Budendorff and Trotter homes. The jury has, we believe, properly fulfilled its function by reaching the factual conclusion, for which there is support in the record, that the “pop” of the air rifle had an effect on Topper’s subsequent behavior.
Yet, the gap that exists between this well protected Canter v. Koehring conclusion[2] and the ultimate conclusion with respect to the liability of Long and his insurer remains unspanned by any evidentiary bridge. Martin, on direct testimony, at the hands of his own able counsel, relates how he arrived at the intersection of the track crossing and the levee still mounted on Topper; observed trains approaching from opposite directions on the two sets of parallel tracks, returned, still mounted, to the top of the levee to look for Mark, returned again to the spot near the tracks and, at that moment: “I just looked down, trying to figure — at the train, trying to figure whether Mark would be able to make it before the trains and whether I should cross or stay on that side. That is the last thing I remember.” He “woke up” in the hospital.
Although able counsel for plaintiff contends in the “Statement of the Case” section of his brief that “Martin Foss was thrown between the parallel rails of the *196 railway trackage . . . ” (emphasis ours), there is absolutely no evidentiary basis for this. It is a surmise founded upon a possible fact of which there is absolutely no positive or circumstantial evidence. It is, at best, a guess, not deducible as an inference but merely a notion founded on a probability-
A substantial number of completely varied possibilities and probabilities exist as to what may have transpired. We know from generally uncontested evidence that Topper returned to the barn and that Topper was not seen by Mark either before or during the actual process of his aiding his injured companion.
Did Martin, still mounted upon Topper, cross the tracks, dismount and head back on foot to look for Mark? Did he dismount before crossing the tracks? Did he wait for one train to pass before starting across, only to be confronted by the other coming from the opposite direction, and did this cause him to dismount?
The word “thrown” never appears in the testimony of any witness nor does any word or series of words indicative of his being thrown. That Martin was thrown is not a factual issue, for there is no evidence, either way, that such an event ever took place. Had ten qualified eyewitnesses testified that Martin was not thrown and one qualified eyewitness had testified that he was thrown, and the jury rendered a verdict for plaintiff, we would affirm, for that factual issue would have been resolved by them with support for same in the record.[3] We are of the view that the record can support (though we would not have so found) a jury determination that Keith Long’s actions “spooked” Topper and caused him to act in a way not, otherwise, likely. Thus, if there was any evidentiary basis whatsoever that Topper had, at any reasonable time thereafter, “thrown” Martin, we would affirm. But there is no showing, none at all, that such was the case, and meeting the burden of proof is just as vital in this respect as with respect to chain of causation. There is no evidence — circumstantial or otherwise— to support this.
This is not a situation where the credible evidence preponderates in favor of a finding that Martin was “thrown” by Topper or even where the jury has, using its great discretion, discounted or disbelieved certain evidence, so that what remains preponderates in favor of the conclusion that Martin was thrown. This is a situation where there simply is no evidence that he was thrown and, thus, is a situation where no evidentiary basis exists for such a conclusion.
Since Martin experienced retrograde amnesia as a result of injuries, he has no recollection and, therefore, no store of knowledge upon which he can base any testimony about what happened from the time that he stopped his horse and was “trying to figure whether Mark would be able to make it before the trains and whether I should cross or stay on that side.” How, then, can liability be assessed?
Adopting the far-ranging definition of causation in fact as discussed in Laird v. Travelers Ins. Co., 263 La. 199, 267 So.2d 714 (La., 1972), and assuming the correctness of the jury’s finding that Keith Long negligently “shot” the air rifle and breached a duty which could result in risk or harm to Martin within the scope of protection afforded by the duty breached, there can be recovery if Keith’s conduct is shown, by some admissable evidence, to be the cause in fact of the injury. What we perceive to be missing here is a vital link in the proof of a chain of causation such as described in Hill v. Lundin, 260 La. 542, 256 So.2d 620 (La., 1972). The natural chain of events arising from the “pop” of the air rifle may or may not have terminated before or after Martin’s injury. The critical issue here is that there is absolutely no proof either way. This results in a failure — as a matter of *197 law — on the part of the plaintiff to carry the burden of proof.[4]
Also apparent from the record is the fact that Martin, according to his own testimony, apparently had the horse under control on two separate occasions after the B-B gun incident: first, when he went back up on the levee to wait for Mark Page, and, again, when he returned to the spot near the railroad tracks. Thus, the causative chain of events arising from Long’s firing of the B-B gun was broken by Martin’s independent failure to remove himself from the potentially dangerous situation since the opportunity so to do twice presented itself and was twice ignored.
We turn to consideration of plaintiff’s jury charge no. 18, the giving of which appellant has challenged in this appeal. We do not find the charge to be clearly prejudicial. Nor, for that matter, do we find error on the part of the able trial judge in connection with the method by which the trial court chose to handle the matter involving the third party demand against Bu-dendorff; the disallowance of the testimony of the clinical psychologist and actuary regarding an alleged differential in the earning capacity of Martin Foss; the rejection of particularized instructions regarding disfigurement; or the rejection of plaintiff’s requested jury charge regarding the railroad’s alleged duty to sound its signal before a street crossing. We believe that the protracted trial of this matter was fairly and efficiently conducted by the able trial judge and handled vigorously and well by able counsel for all litigants. We do take note of the inadvertent failure to cast Robert A. Long individually, although he is cast as administrator of the estate of his minor son, Keith Long, and also note the general agreement of all counsel at the time of the argument of this matter that the judgment should be amended accordingly if we should otherwise affirm.
However, for the reasons previously discussed, we must reverse.
Accordingly, it is ordered that the judgment of the Civil District Court for the Parish of Orleans, dated October 17, 1975, be reversed and set aside, and it is now ordered, adjudged and decreed that there be judgment herein in favor of Robert A. Long, individually and as administrator of the estate of his minor son, Keith Long, and Lumbermen’s Mutual Casualty Company and New Orleans Terminal Company and Alabama Great Southern Railroad Company (Southern Railway Company), and against Edward J. Foss, individually, and Martin Foss (now a major), dismissing their suit at their cost. All parties shall bear their own costs of. this appeal.

REVERSED AND RENDERED.

LEMMON, J., concurs and assigns reasons.

. The “shot,” as such, was nothing more or less than the “pop” of the air rifle. There is no evidence that the air rifle was loaded with a pellet or B-B; much less that the horse was struck by a sort of pellet or B-B.

. Canter v. Koehring Company, 283 So.2d 716 (La., 1973).

. Likewise, with respect to circumstantial evidence and/or expert opinions based upon credible evidence.

. As previously noted in this opinion, the record fails to deal with this order of proof in any way. There simply is no evidence on the vital issue of how Martin got from where he remembers being to where he was discovered.